**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Christine M. Arguello**

Civil Action No. 08-cv-02498-CMA

CHARLES E. KNIGHT,

  Plaintiff,

v.

MICHAEL J. ASTRUE, Commissioner of Social Security,

  Defendant.

---

**ORDER REGARDING DECISION OF ADMINISTRATIVE LAW JUDGE**

---

Pursuant to 42 U.S.C. § 405(g), Plaintiff Charles Knight appeals from the denial of disability benefits by the Social Security Commissioner ("Commissioner").  After a hearing on Plaintiff's application, the Administrative Law Judge ("ALJ") found that Plaintiff was not disabled within the meaning of the Social Security Act ("Act") because Plaintiff could perform gainful work within the regional and national economies despite his severe impairments.

## BACKGROUND

**I.  MEDICAL HISTORY**

Plaintiff was born May 25, 1948.  (Administrative Record ("Admin.") at 139.)  He graduated high school, has been married once, and, during most of the relevant time period in this case, lived in Colorado Springs, Colorado, where he lived with and cared for his elderly mother.  Although Plaintiff suffers from Hepatitis C, his primary allegations

of disability relate to depression, obsessive-compulsive disorder ("OCD"), personality disorder, eczema, and reactive airway disease.

Plaintiff received most of his medical treatment from Dr. Karen Campbell. Dr. Campbell saw Plaintiff regularly beginning in January 2000 and continuing through the date of the ALJ hearing in this matter in 2007. Dr. Campbell's notes reflect that Plaintiff had abused alcohol and illicit drugs for much of his life, but that his drinking and drug use decreased or stopped when Plaintiff began to care for his mother in 2000. (*Id.* at 284-85.) At Plaintiff's first visit, Dr. Campbell assessed Plaintiff as having excema, depression with symptoms of anhedonia, insomnia, and decreased energy, and she noted that Plaintiff may have Hepatitis C. (*Id.* at 284-86.)

At a follow up visit in February 2000, Dr. Campbell noted that Plaintiff was "alert [and] oriented," and although he did not look at her directly, Plaintiff appeared "to be not anxious and in no distress." (*Id.* at 281.) Dr. Campbell confirmed her diagnosis of Hepatitis C with laboratory results and, based on testing by another doctor, she diagnosed Plaintiff with "[s]evere depression, in need of medication." She started Plaintiff on Elavil for his depression and prescribed a hydrocortisone ointment for his excema. (*Id.* at 281.)

Dr. Campbell's notes reveal similar impressions and a consistent diagnosis of depression for the next seven years. For example, at a March 2000 visit, Dr. Campbell discontinued the Elavil (because Plaintiff reported that it made him more depressed) and started Plaintiff on Prozac. (*Id.* at 279-80.) Dr. Campbell also refilled Plaintiff's

asthma inhaler prescriptions and suggested that Plaintiff attend Alcoholics Anonymous and Narcotics Anonymous, but Plaintiff stated that he had attended AA before and did not find it useful.  (*Id.* at 280.)  In May 2000, Dr. Campbell noted that Plaintiff appeared "alert, smiling, oriented and . . . in no distress."  (*Id.* at 275.)  She continued his Prozac prescription and modified his other prescriptions due to complaints of sleepiness and an inability to get out of bed in the morning.  (*Id.*)  In July 2000, Dr. Campbell added Buspar in addition to the Prozac and explained to Plaintiff that sometimes the combination of the Buspar and Prozac works better than Prozac, alone.  (*Id.* at 274.)

Dr. Campbell continued to monitor Plaintiff's general health and maintain and adjust his prescriptions for asthma, depression, and other acute issues as they arose. (*Id.* at 182-294.)  Dr. Campbell's notes reflect that Plaintiff consistently presented as alert, pleasant, talkative, and in no acute distress.  (*See, e.g.*, *id.* at 187, 188, 190, 239, & 243.)  However, Dr. Campbell continually adjusted Plaintiff's anti-depressant medication by altering the dosage of Prozac and mixing and matching different accompanying drugs, *e.g.*, Effexor and Buspar.  Her records reflect a continued diagnosis of depression and fairly consistent reports from Plaintiff of depressive symptoms.

The records also note that Plaintiff repeatedly failed to follow Dr. Campbell's instructions.  For example, in December 2003, Dr. Campbell noted that Plaintiff had been "noncompliant" in taking the Effexor that Dr. Campbell had previously prescribed. (*Id.* at 243.)  Likewise, in September 2005, Dr. Campbell described how she had to

re-instruct Plaintiff on the proper usage of his Asmacort and albuterol.  (*Id.* at 234.)

In any event, by January 2006, Dr. Campbell noted that she and Plaintiff had

"exhausted all of [their] resources" regarding Plaintiff's depression, and she suggested

that he contact Pikes Peak Mental Health to set up an appointment.  (*Id.* at 232.)

Plaintiff eventually visited Pikes Peak Mental Health on October 18, 2007, where

he saw Chris Estep, a licensed counselor, for treatment of his depression.  (*Id.* at 295.)

In November 2007, Mr. Estep filled out a Mental Impairment Questionnaire (at Plaintiff's

counsel's request), in which Mr. Estep checked multiple boxes indicating that Plaintiff

had mental health limitations that rendered him "[u]nable to meet competitive

standards."  (*Id.* at 313-16.)  For example, Mr. Estep checked a box indicating that

Plaintiff could not complete a normal workday and workweek without interruptions from

psychologically based symptoms.  (*Id.* at 313.)  Ms. Estep checked additional boxes

reflecting that Plaintiff could not deal with normal work stress, interact appropriately with

the general public, or maintain socially appropriate behavior.  (*Id.* at 313-14.)  He also

assigned Plaintiff a Global Assessment of Functioning ("GAF") score of 56.[1]  Additional

records from Mr. Estep reflect continued efforts at counseling, but continuing

depression.  (*See, e.g., id.* at 326.)

As part of his application for benefits, Plaintiff also saw Drs. Nouhi and Jones for

consultative examinations.  (*Id.* at 165-74.)  In his physical exam, Dr. Nouhi noted that

---

[1]  A GAF score between 51 and 60 reflects moderate symptoms and/or moderate
difficulty in social, occupational, or school functioning.

Plaintiff appeared "somewhat anxious," but that Plaintiff followed commands appropriately, was alert and oriented to person, place, time, and date, and cooperative with the examination.  (*Id.* at 172.)  Dr. Nouhi diagnosed Plaintiff with reactive airway disease, COPD, eczema, depression (subject to a psychiatric referral), and a learning disorder.  (*Id.* at 173.)  Dr. Nouhi specifically suggested that Plaintiff would benefit from a cognitive evaluation.  (*Id.* at 174.)  Dr. Nouhi did not place any postural, manipulative, or strength limitations on Plaintiff, but suggested that Plaintiff should avoid pulmonary irritants.  (*Id.*)

Dr. Jones performed a mental examination of Plaintiff.  Dr. Jones described Plaintiff as cooperative and congenial, but noted that Plaintiff arrived at the examination unshaven and somewhat disheveled.  (*Id.* at 168.)  Dr. Jones questioned whether Plaintiff's past substance abuse had contributed to his cognitive, memory, and concentration issues.  (*Id.* at 168-69.)  Dr. Jones diagnosed Plaintiff with dysthymic disorder, chronic, moderate to severe, and noted that it "does not appear to be very well controlled on the Prozac that [Plaintiff] is taking."  (*Id.* at 169.)  Dr. Jones also diagnosed Plaintiff with OCD with compulsive hand washing and personality disorder. (*Id.*)  He stated that Plaintiff's GAF score was "probably in the 55 to 60 range, 60 at the present time."  (*Id.*)

Drs. Canham and Ryan reviewed Plaintiff's records and provided a Physical Residual Functional Capacity Assessment and a Psychiatric Review Technique, respectively.  Dr. Canham found that Plaintiff suffered from COPD, asthma, and

eczema, but that these conditions caused only minor physical limitations on Plaintiff's ability to tolerate temperature extremes, and concentrated exposures to wetness, humidity, fumes, odors, gases, dusts, and poor ventilation.  (*Id.* at 160.)  Dr. Ryan concluded that Plaintiff had non-severe mental health impairments including dysthymia, OCD, and alcohol abuse.  (*Id.* at 145, 157, & 150.)  She concluded that Plaintiff suffered only mild functional limitations in the areas of maintaining social functioning and maintaining concentration.  (*Id.* at 152.)

Plaintiff also filled out forms describing his own symptoms and daily routine. He stated that he cared for his mother, including making meals, shopping occasionally, and accompanying her to doctors appointments.  (*Id.* at 118-19.)  Plaintiff indicated that he could care for himself, *e.g.,* he had no problems with personal hygiene or keeping track of his finances and could perform household chores, but he slept odd hours at night and frequently during the day.  (*Id.* at 118-21.)  Plaintiff stated that he does not drive and that his sister drives him or he takes public transportation when necessary. (*Id.* at 121.)  Plaintiff stated that he tires easily, which affects his physical abilities and that he has difficulty concentrating and following written directions.  (*Id.* at 123.)

## II.   PROCEDURAL HISTORY

### A.   The ALJ Hearing

The hearing began with discussion between the ALJ and Plaintiff's counsel regarding the evidence in the record before the ALJ.  Plaintiff's counsel noted that he

had not submitted certain documents before the hearing, but that he would do so as soon as possible.  (*Id.* at 331-37.)

The ALJ then began his examination of Plaintiff.  Plaintiff stated that he earned a high school diploma and that he had not worked since 2005, the date of his application. (*Id.* at 338.)  The ALJ then asked about Plaintiff's mother and Plaintiff's role in caring for her.  (*Id.* at 338-40.)  Plaintiff stated that a nurse visited with Plaintiff's mother and took care of her bathing and minor medical needs, while Plaintiff cooked meals, arranged for her transportation to various doctors appointments, and shopped for food and general necessities.  (*Id.*)

The discussion turned to Plaintiff's own medical history.  Plaintiff indicated that he had seen a doctor in approximately 2000 for potential hearing loss, but that he had not been prescribed a hearing aid and had not followed up on the hearing issue since then. (*Id.* at 341.)  The ALJ then asked Plaintiff about his initial visit with a psychologist, Mr. Estep, at Pikes Peak Mental Health.  Plaintiff described the visit as an "intake" visit that involved questioning about Plaintiff's behaviors and general mental health.  (*Id.* at 340-41.)  Plaintiff testified that his depression was "about the same" for the previous two years and the some days were worse and other days were "not too bad."  (*Id.* at 343.) Plaintiff denied drinking alcohol since he had moved to Colorado to take care of his mother and had been diagnosed with Hepatitis C in 2000.[2]  (*Id.*)  When asked if his

---

[2]  Plaintiff also denied any recent illicit and/or recreational drug use.  (*Id.* at 344.)

7

mental health were to improve, would he be able to look for work, Plaintiff stated that he could not leave his mother alone.  (*Id.*)

Plaintiff's counsel then asked Plaintiff a series of questions regarding his health and daily routine.  Plaintiff stated that he slept a lot on his bad days, but that he still tended to his mother.  (*Id.* at 345-46.)  Plaintiff also described the anti-depressant medications he was on, Prozac (80 mg) and Buspar, but he said that he did not notice any positive or negative effects from the drugs.  (*Id.* at 347-48.)  He also noted that one such drug, Effexor, made him feel "weirder," so he stopped taking it.  (*Id.* at 346.)  Plaintiff testified that he felt stressed as a result of his financial situation and his mother's health.  (*Id.* at 348.)

Plaintiff then testified regarding his reactive airway disease and allergies.  He stated that he took various asthma medications, including Proventil, Zyrtec, and Singulair, six or seven times per day.  (*Id.* at 349.)  Plaintiff stated that short walks would bring on breathing problems, as would smoking, which Plaintiff admitted to doing occasionally.  (*Id.* at 350-51, 357.)  Plaintiff also described problems with his memory; he stated that he would forget things like his keys or things he read.  (*Id.* at 351.)  However, Plaintiff stated that his Hepatitis C did not cause him problems, except for the occasional pain, but he was not sure whether it was his liver or whether he was "just . . . getting old."  (*Id.* at 352.)

When asked by his lawyer whether he had any other limitations, Plaintiff stated that he did not like to "be around a lot of people too much."  (*Id.*)  He could not explain

8

why he felt this way, but he stated that he used to drink alcohol to tolerate being around people.  (*Id.* at 353.)  He testified that he did not like the feeling of having people watching him at work and that supervision made him nervous.  (*Id.* at 356.)  Plaintiff stated that he had a few friends, but they all lived in California.  (*Id.*)  His only friends in Colorado were his mother and his sister.  (*Id.*)  Plaintiff stated that he did not go to church, he just went to the store, his mother's doctors appointments, and his own doctor's office.  (*Id.* at 354.)  However, Plaintiff stated that he liked to go to the store at 5:00 in the morning because it was faster and meant that he would not have leave his mom home alone for very long.  (*Id.* at 354.)

On re-examination by the ALJ, Plaintiff stated that he liked to read military history, but that it took him "quite a while to get through" books and magazines.  (*Id.* at 358.)  Plaintiff also testified that he watched the news "quite a bit" and that he read some of the Sunday newspaper.  (*Id.* at 361.)  He also stated that he did not have trouble remembering to give his mother her medication; he knew what medication she was supposed to take according to the color of the pill and that she was supposed to take it at meal time.  (*Id.* at 360-61.)

The vocational expert, Ruth Van Vleet testified next.  The ALJ gave Ms. Van Vleet a hypothetical question, asking her to assume a man of Plaintiff's age who could frequently lift and/or carry twenty-five pounds, occasionally lift and/or carry 50 pounds, sit, stand, or walk with normal breaks for six hours per eight-hour-day, frequently climb ramps and stairs, occasionally climb ladders, ropes, and scaffolds, frequently balance,

stoop, kneel, crouch, and crawl, with no manipulative, visual, or communicative limitations, but who should avoid concentrated exposure to extreme temperatures, humidity, fumes, odors, dust, gases, and poor ventilation.  (*Id.* at 362.)  Ms. Van Vleet stated that such an individual could perform jobs that existed within the national economy, including an assembler and grocery store bagger.  However, Ms. Van Vleet noted that if an individual is adverse to the public, that limitation would "be an issue" with the grocery store bagger job.  Ms. Van Vleet also speculated that the ALJ's hypothetical person could perform work as a dishwasher, but the ALJ noted that such work might involved concentrated exposure to humidity and bleaches.  (*Id.*)

Plaintiff's counsel then re-examined Plaintiff regarding a head injury Plaintiff suffered in the 1980s.  (*Id.* at 365-66.)  Next, Plaintiff's counsel asked Plaintiff about compulsive hand washing, to which Plaintiff responded that he washed his hands "all the time."  (*Id.* at 366.)  He estimated that he washed his hands at least 24 times per day, typically when he used the bathroom or helped his mom, but that he did not have any other compulsive symptoms.  (*Id.* at 367.)

The hearing concluded with a discussion between the ALJ and Plaintiff's counsel regarding Plaintiff's physical functional limitations as they related to Ms. Van Vleet's testimony.  (*Id.* at 367-71.)  The ALJ then wished Plaintiff luck with his mother and ended the hearing.

B.      The ALJ's Written Decision

The ALJ issued his written decision denying Plaintiff's application on December

11, 2007. (*Id.* at 11-22.)  The ALJ opened his decision with a concise description of the

procedural history of this case.  (*Id.* at 14.)  He then described the applicable law in

some detail, including the five-step disability determination process, the method for

deciding the weight to give to medical opinions, and the burden to establish the

availability of jobs in the economy.  (*Id.* at 24-25.)  The ALJ then described ten findings

of fact and conclusions of law.  (*Id.* at 16-22.)

Regarding the first step of the sequential process, the ALJ concluded that

Plaintiff had not engaged in substantial gainful activity since June 29, 2005.  (*Id.* at 16.)

Regarding the second step of the process, the ALJ concluded that Plaintiff had the

following severe impairments:  COPD, eczema, dysthymia, OCD, and a history of

alcohol abuse – not material.  (*Id.*)  The ALJ rejected Plaintiff's claim that hearing loss

was also a severe impairment.  (*Id.*)  At the third step, the ALJ determined that none of

Plaintiff's severe impairments met or equaled a listed impairments.  (*Id.*)  So, the ALJ

turned to step four of the sequential process, an assessment of Plaintiff's residual

functional capacity ("RFC").  (*Id.* at 17.)

The ALJ found that Plaintiff could perform a full range of medium work.  (*Id.*)

That is, the ALJ concluded Plaintiff:  could frequently lift and/or carry twenty-five

pounds; occasionally lift and/or carry 50 pounds; sit, stand, or walk with normal breaks

for six hours per eight-hour-day; frequently climb ramps and stairs; occasionally climb

ladders, ropes, and scaffolds; frequently balance, stoop, kneel, crouch, and crawl; but he should avoid concentrated exposure to extreme temperatures, humidity, fumes, odors, dust, gases, poor ventilation, unprotected heights, and hazardous machinery. (*Id.*)  The ALJ found Plaintiff could understand, remember, and carry out simple instructions, respond appropriately to supervision, coworkers, and usual work situations, deal with changes in a routine work setting, and sustain the pace and concentration required in a ordinary work setting on a reasonably sustained basis.  (*Id.*)  In making this assessment, the ALJ stated that he considered all symptoms and the extent to which the symptoms can be reasonably accepted as consistent with the objective medical evidence under the governing regulations and the Act.  (*Id.*)

The ALJ also explained in some detail the legal process he used evaluate the symptoms as alleged by Plaintiff including the evidence he relied on from the record. (*Id.* at 18-19.)  The ALJ determined that Plaintiff's impairments could produce the symptoms alleged by Plaintiff, but Plaintiff's allegations regarding the severity and intensity of the symptoms were "not entirely credible." (*Id.* at 19.)  The ALJ discredited Plaintiff's allegations in part because of Plaintiff's noncompliance with his doctors, noting, for example that the Plaintiff had seen improvement in his asthma, but continued to smoke.  (*Id.*)  The ALJ also concluded that Plaintiff's allegations were inconsistent with the medical evidence.  For example, the ALJ noted that Plaintiff's claims of hearing loss found no objective support in the medical records.  (*Id.* at 19-20.)

The ALJ assigned "great weight" to the opinions of Drs. Nouhi and Jones because he found them consistent with the substantial medical evidence. (*Id.*) However, the ALJ found Mr. Estep's opinion unpersuasive because Mr. Estep did not treat Plaintiff at the time (it appears that Mr. Estep had only seen Plaintiff once before the hearing) and the ALJ also found Mr. Estep's opinion internally inconsistent because his suggested GAF score of 56 did not comport with the mental limitations that Mr. Estep identified elsewhere. (*Id.* at 20.)

Moving to the final step of the sequential process, the ALJ found that Plaintiff could not perform his previous work, a construction laborer, but that jobs for a person with Plaintiff's age, education, skills, and RFC existed in significant numbers in the national economy. (*Id.* at 21.)  Specifically, the ALJ found that such a person could perform the job suggested by Ms. Van Vleet, a grocery store bagger, 180,000 of which existed in the national economy. (*Id.*)  With these conclusions and findings in mind, the ALJ concluded that Plaintiff was not disabled within the meaning of the Act. (*Id.* at 22.)

## STANDARD OF REVIEW

Section 405(g) of the Act establishes the scope of this Court's review of the Commissioner's denial of disability insurance benefits.  *See* 42 U.S.C. § 1383(c)(3) (incorporating review provisions of 42 U.S.C. § 405[g]).  Section 405(g) provides, in relevant part, that:

> [t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive, and where a claim has been denied by the Commissioner of Social Security or a decision is rendered under subsection (b) of this section which is adverse to an

13

individual who was a party to the hearing before the Commissioner of Social Security, because of failure of the claimant or such individual to submit proof in conformity with any regulation prescribed under subsection (a) of this section, the court shall review only the question of conformity with such regulations and the validity of such regulations.

42 U.S.C. § 405(g).  Thus, this Court's review is limited to determining whether the record as a whole contains substantial evidence supporting the Commissioner's decision.  *See* § 405(g); *Hamilton v. Sec'y of Health & Human Servs.*, 961 F.2d 1495, 1497–98 (10th Cir. 1992).  The Court must uphold the Commissioner's decision if it is supported by substantial evidence.  See *Dollar v. Bowen*, 821 F.2d 530, 532 (10th Cir. 1987).  This Court cannot re-weigh the evidence nor substitute its judgment for that of the ALJ.  *Jordan v. Heckler*, 835 F.2d 1314, 1316 (10th Cir. 1987).  That does not mean, however, that review is merely cursory.  To find that the ALJ's decision is supported by substantial evidence, the record must include sufficient relevant evidence that a reasonable person might deem adequate to support the ultimate conclusion. *Frey v. Bowen*, 816 F.2d 508, 512 (10th Cir. 1987).  A decision is not based on substantial evidence if it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence supporting it.  *Turner v. Heckler*, 754 F.2d 326, 328 (10th Cir. 1985).  The ALJ's decision is also subject to reversal for application of the wrong legal standard.  *Bernal v. Bowen*, 851 F.2d 297, 299 (10th Cir. 1988); *Frey*, 816 F.2d at 512.

## **ANALYSIS**

Under the standard of review described above and the applicable law described below, the Court will affirm the ALJ's decision.

14

## I.   APPLICABLE LAW

A claimant must qualify for disability insurance benefits under the Act.  To do so,

the claimant must meet the insured status requirements, be less than sixty-five years

of age and under a "disability."  *Flint v. Sullivan*, 951 F.2d 264, 267 (10th Cir. 1991).

The Act defines a disability as an inability "to engage in any substantial gainful activity

by reason of any medically determinable physical or mental impairment which can be

expected to result in death or which has lasted or can be expected to last for a

continuous period of not less than twelve months."  42 U.S.C. § 1382c(a)(3)(A).

In proving disability, a claimant must make a prima facie showing that he is unable

to return to the prior work he has performed.  *Huston v. Bowen*, 838 F.2d 1125, 1132

(10th Cir. 1988).  Once the claimant meets that burden, the Commissioner must show

that the claimant can do other work activities and that the national economy provides

a significant number of jobs the claimant could perform.  *Frey*, 816 F.2d at 512.

The Commissioner has established a five-step process to determine whether a

claimant qualifies for disability insurance benefits.  *See* 20 C.F.R. § 404.1520; *Bowen v.*

*Yuckert*, 482 U.S. 137, 140–42 (1987) (describing five-step analysis).  A claimant may

be declared disabled or not disabled at any step; and, upon such a determination, the

subsequent steps may be disregarded.  *See* 20 C.F.R. § 404.1520(a); *Williams v.*

*Bowen*, 844 F.2d 748, 750 (10th Cir. 1988).  First, the claimant must demonstrate that

he is not currently involved in any substantial gainful activity.  20 C.F.R. § 404.1520(b).

Second, the claimant must show a medically severe impairment (or combination of

impairments) which limits his physical or mental ability to do basic work activities.

§ 404.1520(c).  At the third step, if the impairment matches or is equivalent to

established listings, then the claimant is judged conclusively disabled.  § 404.1520(d).  If

the claimant's impairments are not equivalent to the listings, the analysis proceeds to

the fourth step.  At this stage, the claimant must show that the impairment prevents him

from performing work he has performed in the past.  *See Williams*, 844 F.2d at 751

(citations omitted).  If the claimant is able to perform his previous work, he is not

disabled.  20 C.F.R. § 404.1520(e); *Williams*, 844 F.2d at 751.  The fifth step requires

the Commissioner to demonstrate that:  (1) the claimant has the RFC to perform other

work based on the claimant's age, education, past work experience; and (2) there is

availability of that type of work in the national economy.  *See*  20 C.F.R. § 404.1520(f);

*Williams*, 844 F.2d at 751.

## II.   THE ALJ CORRECTLY DECLINED TO INCLUDE PERSONALITY DISORDER AS A SEVERE IMPAIRMENT

First, Plaintiff contends the ALJ erred by failing to conclude that Plaintiff suffered

from a severe impairment in the form of a personality disorder.  However, because only

one consultative reviewer mentioned the possibility of a personality disorder, the Court

concludes that the ALJ did not err in declining to find that Plaintiff suffered from a

personality disorder.

To meet his burden at step two of the sequential process, an applicant must

establish an impairment that "significantly limits the claimant's ability to do basic work

activity."  *Hawkins v. Chater*, 113 F.3d 1162, 1169 (10th Cir 1997).  Although, a

claimant's burden at this stage is *de minimis*, the claimant must present at least some

medical evidence from which the Commissioner can find that a physical or mental

condition actually affects the claimant's ability to perform work functions.  *Id.* (citing

*Williams*, 844 F.2d at 751); *see also Hinkle v. Apfel*, 132 F.3d 1349, 1352 (10th Cir.

1997) (noting that claimant's burden is *de minimis*, "However, the claimant must show

more than the mere presence of a condition or ailment.").

      In this case, only Dr. Jones, the consultative doctor, noted that Plaintiff may

suffer from a personality disorder.  However, as the Commissioner points out, Dr. Jones

did not discuss his diagnosis at any length and Dr. Jones provided no objective medical

evidence to support the diagnosis.  Further, in contrast to Plaintiff's allegations that he

suffered from a debilitating personality disorder, medical records from Drs. Campbell

and Nouhi and even Dr. Jones, reflect that Plaintiff presented as cooperative, alert,

occasionally "smiling" or "talkative," and lacking in distress, and that his speech and

cognition were generally logical and coherent.  Moreover, Dr. Ryan, whose opinion the

ALJ found consistent with the substantial medical evidence, found no evidence of

personality disorder like that claimed by Plaintiff.

      Thus, the ALJ's decision not to include personality disorder as a severe

impairment is supported by substantial evidence in the record.

## III.    THE ALJ CORRECTLY ASSESSED PLAINTIFF'S RFC

      Second, Plaintiff contends that the ALJ erred in assessing his RFC because the

ALJ did not account for Plaintiff's OCD and personality disorder.  Plaintiff contends that

the ALJ should have included a limitation in his the RFC analysis for Plaintiff's

compulsive hand washing and anxiety attacks.

The Commissioner must assess an RFC based on all of the relevant evidence

in the record.  *See* SSR 96-8P.  This includes consideration of the medical evidence,

evidence of the claimant's daily activities, and evidence regarding a claimant's

motivation to find employment.  *See id.*; *Ray v. Bowen*, 865 F.2d 222, 226 (10th Cir.

1989).  With regard to the claimant's own allegations, credibility is the unique province

of the ALJ and this Court cannot overturn the ALJ's decision on that issue unless it is

not supported by substantial evidence.  *See Hackett v. Barnhart*, 395 F.3d 1168, 1173

(10th Cir. 2005) (citing *Diaz v. Secretary of Health & Human Servs.*, 989 F.2d 774, 777

(10th Cir. 1990)).

A.     Compulsive Hand Washing

In this case, the ALJ concluded that Plaintiff's OCD amounted to a severe

impairment, but the ALJ did not identify any functional limitations that were attributable

directly to Plaintiff's OCD, nor did the ALJ ask Ms. Van Vleet a hypothetical that

included any limitations stemming directly from Plaintiff's OCD.  Plaintiff contends this

was an error and the Commissioner does not address this issue in his brief.  However,

the ALJ's RFC assessment need not be overturned on this issue because the Court

finds that Plaintiff's frequent hand washing did not present a functional limitation.

Although the administrative record contains repeated references to Plaintiff's dry

skin and red, cracked hands, none of the medical records support Plaintiff's contention

that his compulsive hand washing actually caused him pain or any other type of physical or mental functional limitation.

Moreover, by his own admission, Plaintiff's hand washing appears to have stemmed more from his own daily routine (*e.g.*, his use of the restroom and care for his mother) than from his OCD.  (*See, e.g.*, Admin. at 367.)  Thus, the ALJ's decision not to ask the vocational expert a hypothetical that includes any limitations stemming from the OCD is supported by substantial evidence.[3]  Further, because the administrative record does not conclusively establish that Plaintiff suffered a functional limitation as a result of his OCD, the ALJ did not err in failing to include compulsive hand washing in Plaintiff's RFC.

B.    Social Anxiety

Plaintiff also contends that the ALJ erred by failing to include functional limitations due to Plaintiff's alleged personality disorder.  Plaintiff argues that regardless of whether the ALJ concluded that the alleged disorder amounted to a severe impairment, the ALJ should have factored Plaintiff's alleged aversion to social situations and the general public into the RFC analysis.  However, Plaintiff again spins the existence of a potential impairment into a limitation that is not supported by the record.  In contrast to Plaintiff's proposed limitation, none of the medical evidence reflects that Plaintiff was

---

[3]   Additionally, after Plaintiff had testified at the ALJ hearing regarding his compulsive hand washing, Plaintiff's counsel asked Ms. Van Vleet if Plaintiff's testimony would erode the availability of the grocery bagger job.  Thus, notwithstanding the ALJ's decision not to ask the vocational expert about Plaintiff's OCD, Plaintiff's counsel asked about the issue and received a negative answer.

functionally limited to avoiding contact with the coworkers, supervisors, or the general public.  Moreover, Plaintiff's own testimony negates this argument.  For example, when asked at the ALJ hearing about why he did not like people, Plaintiff responded with the less than equivocal, "I just, I don't know, I'm just shy, I guess." (*Id.* at 353.)  Plaintiff also stated that his primary reason for going to the store at 5:00 a.m. was not to avoid interacting with the public, but to minimize the time that he spent away from his mother. (*Id.* at 354.)  Absent medical evidence to the contrary, these statements are not the statements of someone who is functionally limited in their contact with general public.

As such, the Court concludes that the ALJ did not err when he declined to include compulsive hand washing or social anxiety within his RFC analysis.

## IV.   THE ALJ ACCORDED APPROPRIATE WEIGHT TO THE MEDICAL EVIDENCE IN THE RECORD

Third, Plaintiff argues that the ALJ erred by failing to discuss the medical evidence from Dr. Campbell and Mr. Estep in his decision.

An ALJ should give controlling weight to the medical opinion of a treating physician if the opinion is supported by "clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record. *See Doyal v. Barnhart*, 331 F.3d 758, 762 (10th Cir. 2003) (quoting 20 C.F.R. § 416.927(d)(2)) (alterations in original); *see also Castellano v. Secretary of Health & Human Servs.*, 26 F.3d 1027, 1029 (10th Cir. 1994).  It follows then that the ALJ should generally accord the opinions of examining physicians less weight than treating physicians. *See Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004).  If the ALJ decides not

to give controlling weight to a treating physician's opinion, the ALJ must "give good reasons" for the weight given to a treating physician's opinion. 20 C.F.R. § 416.927(d)(2); *see also Drapeau v. Massanari*, 255 F.3d 1211, 1213 (10th Cir. 2001) (requiring ALJ to supply "specific, legitimate reasons" for rejecting opinion of treating physician).

      A.    <u>Dr. Campbell</u>

In this case, the ALJ did not mention Dr. Campbell by name in his written decision.  However, in contrast to Plaintiff's argument, the ALJ did not ignore Dr. Campbell's opinions regarding Plaintiff's depression.  The ALJ stated that he gave consideration to all of the evidence in the record (Admin. at 19) and he explicitly discussed evidence of Plaintiff's treatment with Dr. Campbell from 2000 through 2005, paying particular attention to Plaintiff's physical ailments, which was appropriate given Dr. Campbell's role as Plaintiff's primary care doctor.  (*Id.*)  The ALJ also noted that Dr. Campbell had attempted to treat Plaintiff's depression for years.  In fact, the ALJ specifically cited to Dr. Campbell's records as the basis for his decision that Plaintiff's depression constituted a severe impairment and that it was not controlled by medication.  Thus, in contrast to Plaintiff's argument, the ALJ's treatment of Dr. Campbell's opinion is in accord with the applicable law and his conclusions are supported by substantial evidence.

B.    Mr. Estep

Plaintiff also contends that the ALJ erred in his treatment of Mr. Estep's opinions. However, in contrast to Plaintiff's arguments, the Court concludes that the ALJ did not completely ignore Mr. Estep's opinions[4] and, to the extent the ALJ rejected them, the ALJ's decision is supported by substantial evidence.

At the time the ALJ issued his decision, the record contained only one treatment note from Mr. Estep and the "Mental Health Questionnaire" that Mr. Estep completed at the request of Plaintiff's attorney.  Thus, the ALJ need not have given Mr. Estep's opinion controlling weight.  Moreover, as the ALJ pointed out, Mr. Estep's Questionnaire contains internal inconsistencies regarding Plaintiff's mental functional limitations. For example, Mr. Estep gave Plaintiff a GAF score of 56, which reflects moderate symptoms and/or moderate limitations on functioning.  This opinion contrasts with Mr. Estep's opinion in the same Questionnaire that Plaintiff suffers from "Extreme" functional limitations in the areas of daily living and his ability to maintain social functioning and Mr. Estep's opinion that Plaintiff suffers from "Marked" functional limitations in the areas of concentration and decompensation.  Such inconsistencies allowed the ALJ to reject Dr. Estep's opinions.  *See Castellano*, 26 F.3d at 1029.

Moreover, Mr. Estep's additional treatment notes, which Plaintiff submitted to the Appeals Council after the ALJ had issued his decision do not alter the ALJ's conclusion.

---

[4]   For example, the ALJ recognized that Plaintiff suffered from depression, a diagnosis that is echoed by Mr. Estep.

Mr. Estep's additional notes contain only brief statements regarding Plaintiff's visits and the notes provide no objective psychological or medical evidence to support the almost total functional limitations proposed by Mr. Estep in the Questionnaire.  As such, the Court concludes that the Appeals Council correctly declined to reconsider the ALJ's decision because the ALJ's decision remained supported by substantial evidence.  *See O'Dell v. Shalala*, 44 F.3d 855, 859 (10th Cir. 1994).

C.      Dr. Ryan

Plaintiff also argues briefly that the ALJ erred in giving "great weight" to Dr. Ryan's opinion.  Plaintiff contends that the ALJ cherry picked only those portions of Dr. Ryan's opinion that supported the ALJ's decision to reject Mr. Estep's opinion.  *See Robinson*, 366 F.3d at 1083 ("The ALJ is not entitled to pick and choose from a medical opinion, using only those parts that are favorable to a finding of nondisability.").

However, the ALJ did not rely on Dr. Ryan's opinions to rebut those of Mr. Estep.  Instead, the ALJ's written decision reflects that the ALJ found Mr. Estep's opinions to be internally inconsistent and inconsistent with the opinions of Plaintiff's treating and examining medical sources.  (Admin. at 20.)  In fact, the ALJ does not even mention Dr. Ryan's opinion.  Thus, the Court concludes that Plaintiff's argument on this issue must fail, as well.

## **CONCLUSION**

Plaintiff contends that the ALJ erred in multiple aspects, but the Court concludes that Plaintiff has failed to show that the ALJ's decision is contrary to the applicable law or unsupported by substantial evidence.

Accordingly,

The Court will AFFIRM the ALJ's decision.

DATED:  October   5  , 2009

BY THE COURT:

_____
CHRISTINE M. ARGUELLO
United States District Judge

24